

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

U S  Commodity Futures Trading Commission,

    Plaintiff,

v

Longhorn Financial Advisors, LLC, Phoenix
Financial Group, Daniel Belbeck,
and Roger Owen

    Defendants

)
)
)
)
)
)  04cv00911(Beaty)
)
)
)
)
)
)

**CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE
RELIEF AGAINST DEFENDANTS LONGHORN FINANCIAL ADVISERS, LLC,
PHOENIX FINANCIAL GROUP AND ROGER OWEN**

## I.    INTRODUCTION

On October 5, 2004, Plaintiff U S  Commodity Futures Trading Commission

(Commission) filed a complaint against Roger Owen, Longhorn Financial Advisers, LLC

(Longhorn) and Phoenix Financial Group (Phoenix)[1] (collectively, Defendants) seeking

injunctive and other equitable relief for violations of the Commodity Exchange Act (Act), 7

U S C  §§ 1 *et seq*  (2002), and Commission Regulations (Regulations), 17 C F R  §§ 1 1 *et seq*

(2004)

## II.    CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the complaint against Defendants without a

trial on the merits or further judicial proceedings, Defendants

1        Consent to entry of this Consent Order of Permanent Injunction and Other

Equitable Relief Against Defendants (the Order),

---

[1]    The Commission's Complaint also brought claims against Daniel Belbeck

2       Affirm that they have read and agreed to this order voluntarily, and that no

promise or threat has been made by the Commission or any member, officer, agent or

representative thereof, or by any other person, to induce consent to this order, other than as set

forth specifically herein,

3       Acknowledge service upon them of the summons and complaint in this action,

4       Admit that this Court possesses personal and subject matter jurisdiction over them

and this action pursuant to Section 6c of the Act, 7 U S C § 13a-1,

5       Admit that venue properly lies with this Court pursuant to Section 6c of the Act, 7

U S C § 13a-1,

6       Waive

    a       All claims that they may possess pursuant to the Equal Access to

            Justice Act (EAJA), 5 U S C § 504 (2000) and 28 U S C § 2412 (2000),

            and Part 148 of the Regulations, 17 C F R § 148 1 *et seq* , relating to or

            arising from this action,

    b       Any claim of double jeopardy based on the institution of this

            proceeding or order imposing civil monetary penalties or any other relief,

            and

    c       All rights of appeal from this order

7       Consent to the continued jurisdiction of this Court for the purpose of enforcing

the terms and conditions of this order and for any other purpose relevant to this matter,

8       Neither admit nor deny the allegations of the complaint and the findings and

conclusions of this order, except as to jurisdiction and venue,

2

9     Agree they shall not take any action or make any public statements denying, directly or indirectly, any allegation of the complaint or findings in this order, or creating or tending to create the impression that the complaint and this order are without factual basis, provided, however, that nothing in this provision affects Defendants' (i) testimonial obligations, or (ii) their right to take legal positions in other proceedings to which the Commission is not a party, and

10     Agree, and the parties to this order intend, that the allegations of the Commission's complaint and all of the findings of fact made by this Court and contained in this order shall be taken as true and correct and shall be given preclusive effect without further proof in any bankruptcy proceeding filed by, on behalf of, or against Defendants, or any proceeding to enforce this order, or any other proceeding relating to the fitness of the defendants to act in various capacities governed by the Act Defendants also shall provide immediate notice of any bankruptcy proceeding filed by, on behalf of, or against them in the manner required by this order

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

Being fully advised in the premises and finding that there is just cause for entry of this order that fully disposes of all issues in this matter, THE COURT FINDS THAT

### FINDINGS OF FACT

A   Background

11     The Commission is an independent federal regulatory agency charged with administering and enforcing the provisions of the Act, 7 U S C §§ 1 *et seq* and Regulations, 17 C F R § 1 1 *et seq*

3

12      Owen is an individual who currently resides at 258 Beachwood Loop, Trinidad,
Texas 75163 He previously resided at 422 W Radiance Drive, Greensboro, North Carolina
27403

13      Owen was the sole owner and operator of Longhorn   Longhorn conducted an
estate planning business that assisted clients in managing their assets  Until 2003, Owen
operated Longhorn out of his home at 422 Radiance Drive, Greensboro, N C   In September
2003, Owen incorporated Longhorn as a Limited Liability Corporation  Upon registering
Longhorn with the North Carolina Department of State, Owen identified himself as the sole
organizer and member of Longhorn  At that time, Longhorn's principal place of business
became 4411 W Market Street, Suite 303, Greensboro, North Carolina 27402   Longhorn was
never registered with the Commission in any capacity

14      Owen was solely responsible for Longhorn's business activities  He was
responsible for the day-to-day operations, such as 1) soliciting prospective clients, 2) developing
promotional material, 3) interacting with clients and handling their complaints, 4) developing
business plans, 5) establishing bank accounts, and 6) hiring staff and determining their salary

15      In early 2003, Owen and Daniel Dowling (Dowling) formed Phoenix as an
unincorporated business entity  They created Phoenix for the sole purpose of promoting
commodities trading  Phoenix's principal place of business was 422 W Radiance Drive,
Greensboro, North Carolina 27403  Phoenix was never registered with the Commission in any
capacity

16      Owen's business responsibilities with Phoenix were similar to his business
responsibilities with Longhorn  Dowling's responsibilities included developing the software and

4

soliciting customers

B    The Trading System

17    In or about 2000, Dowling developed a computerized trading system, alternatively called The Equity Recovery Program or the 60 Minute Swing Trading Program (the "Trading System")  The Trading System consisted of a computer program that was designed to predict market movements of, among other things, the S&P 500 and NASDAQ 100 e-mini futures contracts and would send alerts or signals via computer about when to buy and sell the contracts

18    Clients  usually paid $6500 to purchase the Trading System  After purchasing the Trading System, a client was required to open a commodity futures trading account at a Futures Commission Merchant ("FCM")  Further, the client was required to execute a power of attorney granting Longhorn's agent and registered Introducing Broker, UTRADE and its Associated Person Frank Ebel ("Ebel"), trading authority over his account  Ebel entered all trades for clients that purchased the Trading System

19    Longhorn's clients began trading with the Trading System in approximately March 2002.  Because of sustained losses suffered by clients using the Trading System, by November 2002, Owen advised clients to stop using the Trading System

C    Solicitations

20    Beginning in early 2002, Longhorn, by and through Owen, began soliciting prospective clients to purchase the Trading System through face-to-face solicitations of prospective clients, dissemination of written promotional materials and by use of the internet  Beginning in early 2003, Phoenix, by and through Owen, solicited customers via the internet and through a newspaper advertisement

**Oral solicitations**

21      Longhorn, by and through Own, made numerous oral misrepresentations and guarantees in order to induce clients to purchase the Trading System and invest money to trade commodities  These statements were either false or were made with reckless disregard for the truth

22      For instance, Owen advised a client in March 2002 to purchase the Trading System and use it to trade commodity futures  Owen represented to this client that he could not lose money trading in commodity futures with the Trading System and guaranteed that the client would make a substantial profit

23      In reliance on Owen's representations, the client invested approximately $23,000, including $6,500 to purchase the Trading System  The client eventually lost $18,945 87 trading commodity futures using the Trading System

24      Owens convinced a second client and her elderly mother to surrender the mother's annuity, pay a surrender charge, and invest more than $8,700 in July 2002 to invest in commodity futures  This client opened an account based upon Owen's advice and began trading using the Trading System

25      By September 2002, the client's account had lost more than one half its original value by trading  When the client requested that the account be closed and the remaining funds be returned to her, Owen informed her that the original investment amount was guaranteed and he would repay it if she continued trading with the Trading System and her account failed to regain the lost funds by January 15, 2003  In reliance on this guaranty, the client agreed to allow Owen to continue trading her account with the Trading System  By November 2002, however,

6

Owen informed the client that her account balance was only $1,894 89 and advised her to close
the account

26    In January 2003, the client asked Owen to honor the guaranty and repay her
original balance of approximately $8,700  Owen informed her that he could not honor the
guaranty  In February 2003, Owen provided a second written guaranty to the client promising to
repay the original account balance plus 5% interest on or before December 15, 2003

27    At the same time, Owen solicited the client to provide him with the $1,894 89
that had remained in her account so that he could combine her money with other investors'
money in order to recoup losses  In reliance on Owen's representations that her original
investment was guaranteed and would be repaid, the client provided Longhorn with a check for
$1,900 to pool with other investors' money

28    In December 2003, Owen provided the client with an account statement showing
that her $1900 investment had grown to $9,387  Starting in July 2004, the client made repeated
and on-going requests that her account be closed and the funds returned  Neither Owen nor
Longhorn has ever repaid any of these funds to the client

29    Owen urged a third client to purchase the Trading System in April 2002  Owen
repeatedly told this client about the success of the Trading System and how Owen was making a
lot of money using the Trading System

30    Owen guaranteed this client that he would not lose money using the Trading
System  Indeed, Owen provided this client with a written guarantee promising that, if after six
months, the client lost money using the Trading System, Owen would refund all the client's
money  Based on Owen's representations, this client invested $30,000, including $6500 to
purchase the Trading System

7

31      By August 2002, this client had lost approximately $20,000  When the client requested that Owen make good on the guarantee, Owen provided a worthless promissory note  To date, this client has not received any money back from Owen.

32      The representations made to these three clients are representative of those made to other Longhorn clients

### Written solicitations

33      As part of Longhorn's marketing plan to solicit prospective clients to use the Trading System, Owen, drafted, prepared and distributed a written promotional pamphlet (pamphlet)  This pamphlet explained and described the trading systems to prospective clients  Owen gave the pamphlet to Daniel Belbeck (Belbeck), a Tennessee-based estate planning adviser, to distribute to his clients and prospective clients in Tennessee  As compensation for Belbeck's services, Owen paid Belbeck a portion of the fee paid by Belbeck's clients for the Trading System

34      The pamphlet claimed that clients using the Trading System actually averaged a profit of $6500 per month on a $30,000 investment  The pamphlet also contained a month-by-month chart of the profits that Longhorn claimed were earned by their clients who purchased the trading system  According to the chart, the Trading System earned profits in excess of 134% in 2000, 66% in 2001 and 40% in 2002  All of these claims were designed to convey the false impression that the trading system successfully earned actual profits in 2000, 2001 and 2002 when, in fact, the trading system never generated a profit for any client

35      As a result of Belbeck's solicitations and dissemination of the pamphlet on behalf of Longhorn, at least 4 clients bought the Trading System

8

36      Further, in an effort to convince prospective clients to use the trading systems,

Owen gave one or more prospective clients an actual trading account statement from an FCM

that reflected a large profit  However, Owen failed to disclose that the trader who achieved these

large profits had not traded using the Trading System

37      All of these written documents were either false or were made with reckless

disregard for the truth

### Internet

38      On behalf of Longhorn, Owen developed a website, www.longhorn-fin-adv.com

(Longhorn website)  The Longhorn website operated between at least January 2002 and at least

April 2003  As late as April 3, 2003, the Longhorn website claimed that a client could earn more

than a 300% profit in three years by turning $30,000 into $110,000 using the Trading System

The Longhorn website did not disclose that every client who purchased the trading system lost

money  Also, it did not disclose that trading for all existing Longhorn clients ceased in

November 2002 because all of Longhorn's clients were losing money  Further, although the

Longhorn website contained a statement regarding the limitations of hypothetical trading, the

website did not indicate that any of the profitability claims made were based on either real or

hypothetical trading results

39      In order to entice prospective clients to purchase the Trading System, Phoenix

also created a website, www.phoenixfinancial.biz (Phoenix website)  As late as April 2003, the

Phoenix website claimed that the Trading System earned in excess of 52% profit for its clients

This claim is false  The Trading System never generated this amount of profit for any client

Moreover, Phoenix engaged in these acts when Owen knew that the Trading System was not

generating profits and that Longhorn had stopped using it because all its clients were losing

9

money Despite this, Phoenix continued to fraudulently claim the likelihood of earning huge profits by using the Trading System

### Newspaper

40    Owen, on behalf of Phoenix, placed a newspaper advertisement on March 23, 2003, in the *News and Record*, a newspaper that is widely distributed in the Greensboro, North Carolina area The advertisement falsely claimed that Phoenix clients earned an average profit exceeding 52% Owen wrote and paid for the advertisement in March 2003, at a time when Owen knew that all clients who purchased the Trading System lost money

D    Trading Results

41    Despite client losses and the temporary cessation of trading using the Trading System in November 2002, Owen continued to solicit new clients Owen solicited at least two additional clients to purchase the Trading System These clients also lost money using the Trading System They ultimately stopped trading in approximately July 2003

42    In total, clients sustained losses of at least $308,439 76 by purchasing and trading using the Trading System Defendants received at least $102,850 in fees from these clients for use of the Trading System

## CONCLUSIONS OF LAW

A    Violations of Section §§ 4b(a)(2)(i) and (iii) of the Act, 7 U S C 6b(a)(2)(i) and (iii)

43    Longhorn, Phoenix and Owen (i) cheated or defrauded or attempted to defraud other persons, and (iii) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a)(2) of the Act, 7

U S C  § 6b(a)(2), all in violation of  Section 4b(a)(2)(i) and (iii) of the Act, 7 U S C  6b(a)(2)(i) and (iii)

44     In particular, during the course of their solicitations, Defendants, knowingly or with reckless disregard for the truth, made oral misrepresentations to customers, provided written materials, and posted results on the internet and in a newspaper that falsely represented the success of the trading system, all in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U S C §6b(a)(i) and (iii) by

B     Violations of Section 4o(1) of the Act, 7 U S C  § 6o(1), and Regulation 4 41(a), 17 C F R  § 4 41(a)

45     As defined in Section 1a(6) of the Act 7 U S C  1a(6), a CTA is any person who for compensation or profit engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or advisability of trading in any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of any contract market or derivatives transaction or, for compensation or profit, and as part of a regular business, issues or promulgates analysis or reports concerning any of the activities referred to above

46     Longhorn and Phoenix acted as CTAs  They solicited prospective clients to purchase a trading system that offered trading advice pertaining to when to buy and sell the S & P 500 and NASDAQ e-mini futures contract  As part of the purchase, Longhorn and Phoenix required clients to sign powers of attorney allowing Ebel, on behalf of Longhorn, and Dowling, on behalf of Phoenix, to manage clients' accounts  In exchange, Longhorn and Phoenix received a fee  Accordingly, for compensation and profit, Longhorn and Phoenix engaged in the business of advising others as to the value or the advisability of trading in futures contracts

11

47     Further, Owen was as an Associated Person of a CTA by soliciting a client's or prospective client's discretionary account and by supervising Belbeck's solicitations while being associated with Longhorn and Phoenix as a partner, officer, employee, consultant, or agent

48     Longhorn, Phoenix and Owen violated Section 4o(1) of the Act, 7 U S C  § 6o(1), and Longhorn and Phoenix violated Section 4 41(a) of the Regulations, 17 C F R  § 4 41(a), in that they directly or indirectly employed a device, scheme or artifice to defraud clients or prospective clients, or engaged in transactions, practices or a course of business which operated as a fraud or deceit upon clients or prospective clients

C     Violations of Sections 4m(1) and 4k(3) of the Act, 7 U S C  §§ 6m(1) and 6k(3)

49     Section 4m(1) of the Act, 7 U S C  § 6m(1), makes it unlawful to use the mails or instrumentalities of interstate commerce to provide commodity trading advice to 15 or more persons during the preceding 12-month period, or to hold oneself out generally to the public as a CTA, unless registered as a CTA under the Act  Commission Regulation 4 14(a)(9) further provides that CTAs that direct the trading in another's commodity interest account are not exempt from being registered as a CTA  17 C F R  § 4 14(a)(9)  Commission Regulation 4 10(f) defines "direct", as used in the context of trading commodity interest accounts, as an "agreement whereby a person is authorized to cause transactions to be effected for a client's commodity interest account without the client's specific authorization "  17 C F R  § 4 10(f)

50     Between at least January 2002 and November 2003, Longhorn, and between at least January 2003 and November 2003, Phoenix, acted as unregistered CTAs in violation of Section 4m(1) without meeting any applicable exemption from registration as a CTA  For example, Longhorn used the Internet and the pamphlet to promote to the public the fact that their clients' earned significant profits using their trading system  Phoenix held itself out to the public

12

as a CTA when it operated its website and published the newspaper advertisement that claimed their managed market strategies resulted in profits for clients

51      Moreover, by using the telephone, a newspaper advertisement, the Internet and the postal service to communicate with their clients and prospective clients, Longhorn and Phoenix used instrumentalities of interstate commerce in connection with their CTA business Accordingly, they acted as CTAs and were required to be registered as CTAs  Their failure to do so constitutes a violation of Section 4m(1) of the Act

52      Section 4k(3) of the Act makes it unlawful for any person to be associated with a CTA as a partner, officer, employee, consultant, or agent in any capacity that involves the solicitation of a client's or prospective client's discretionary account or the supervision of any person or persons so engaged, unless such person is registered with the Commission as an AP of the CTA

53      Owen acted as an Associated Person of Longhorn and Phoenix, respectively, by solicited clients and prospective clients to provide funds for discretionary futures accounts traded in accordance with the trading system sold by Longhorn and Phoenix  Owen also supervised Belbeck's solicitation of prospective clients  Therefore, Owen violated Section 4k(3) of the Act by engaging in these acts without being registered

54      Longhorn violated Section 4k(3) of the Act by knowingly permitting Owen to act as an Associated Person without registering

55      Phoenix violated Section 4k(3) of the Act by knowingly permitting Owen to act as an AP without registering

D    Violations of Regulations 4 31(a) and (b), 17 C F R §§ 4 31(a) and (b)

56    Section 4 31(a) of the Regulations, 17 C F R §§ 4 31(a), provides that any CTA registered or required to be registered under the Act is prohibited from soliciting a prospective client, or entering into agreements with a prospective client, to direct the client's commodity futures trading account unless the CTA "at or before the time it engages in the solicitation or enters into the agreement (whichever is earlier), delivers or causes to be delivered to the prospective client a Disclosure Document for the trading program pursuant to which the trading advisor seeks to direct the client's account " Section 4 31(b), 17 C F R §§ 4 31(b), prohibits a CTA from entering into an agreement to direct a client's account unless the CTA has received a signed acknowledgement from the client which states that the client has "received a Disclosure Document for the trading program pursuant to which the trading advisor will direct his account "

57    From January 2002 until November 2003, Longhorn violated Regulations Sections 4 31(a) and (b) by 1) soliciting and entering into agreements to manage client accounts without first delivering the mandatory Disclosure Documents to these prospective clients prior to managing such accounts, and 2) without receiving back from these prospective clients an acknowledgement that these prospective clients received the Disclosure Documents

E    Owen is a Controlling Person of Longhorn and Phoenix
     Pursuant to Section 13(b) of the Act, 7 U S C § 13c(b)

58    A controlling person is "[a]ny person who, directly or indirectly, controls any person who has violated any provision of the Act [if that controlling person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation " Section 13(b) of the Act, 7 U S C § 13c(b)

59      Owen directly or indirectly controls or controlled Longhorn and did not act in good faith or knowingly induced, directly or indirectly, the conduct by Longhorn that is alleged in this Count   Owen therefore is a controlling person and is liable for these acts pursuant to Section 13(b) of the Act, 7 U S C  § 13c(b)

60      Owen directly or indirectly controls or controlled Phoenix and did not act in good faith or knowingly induced, directly or indirectly, the conduct by Phoenix that is alleged in this Count   Owen therefore is a controlling person and is liable for these acts pursuant to Section 13(b) of the Act, 7 U S C  § 13c(b)

F       Longhorn and Phoenix are Liable for the Acts of Their Employees and Agents
        Pursuant to Section 2(a)(1)(B) of the Act, 7 U S C  § 2(a)(1)(B)

61      Section 2(a)(1)(B), 7 U S C  § 2(a)(1)(B), of the Act provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person "

62      The foregoing fraudulent acts, misrepresentations, and omissions of Owen occurred within the scope of his employment or office with Longhorn   Longhorn is therefore liable for these acts pursuant to Section 2(a)(1)(B) of the Act

63      The foregoing fraudulent acts, misrepresentations, and omissions of Owen occurred within the scope of his employment or office with Phoenix   Phoenix is therefore liable for these acts pursuant to Section 2(a)(1)(B) of the Act

64      Plaintiff has demonstrated good cause why equitable remedies, including restitution and trading bans, should be imposed on various Defendants as set forth below

15

## IV.   ORDER OF PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

65   Based upon and in connection with the foregoing conduct, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly

a   Cheating or defrauding or attempting to cheat or defraud other persons, willfully making or willfully deceive or attempt to deceive any person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person or deceiving or attempting to deceive other persons by making false, deceptive or misleading representations of material facts, by failing to disclose material facts, and by misappropriating customer funds in or in connection with orders to make, or the making of, contracts of sale of commodities for futures delivery, made or to be made for or on behalf of any other person, in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U S C  § 6b(a)(2)(i) and (iii) and specifically from engaging in any commodity-related activity including making sales solicitations to clients that

- misrepresents the profit potential of a commodities trading system,
- guarantees or misrepresents the profit potential of trading commodity futures and/or options,
- misrepresents the past performance history for a commodity trading system,
- fails to provide an accurate track record of how a commodity trading system,

16

- omits any material facts necessary to make other facts disclosed not misleading

b      . Employing a device, scheme or artifice to defraud clients or prospective

clients, or engaging in transactions, practices or a course of business which

operate as a fraud or deceit upon clients or prospective clients, in violation of

Section 4o(1) of the Act, 7 U S C  § 6o(1), and Section 4 41(a) of the Regulations,

17 C F R  § 4 41(a) and specifically from engaging in any commodity-related

activity including making sales solicitations to customers that

- misrepresents the profit potential of a commodities trading system,

- guarantees or misrepresents the profit potential of trading commodity futures and/or options,

- misrepresents the past performance history of a commodity trading system,

- fails to provide an accurate track record for a commodity trading system,

- omits any material facts necessary to make other facts disclosed not misleading

c      Being associated with and acting as a partner, officer, employee,

consultant of a Commodity Trading Advisors, in a capacity requiring registration

with the Commission, without being registered as an Associated Persons with the

Commission or having a valid exemption from such registration in violation of

Section 4k(3) of the Act, 7 U S C  §6k(3), and

d      Using the mails or any means or instrumentality of interstate commerce in

connection with a business as a commodity trading advisor, unless registered with

the United States Commodity Futures Trading Commission in violation of Section

4m(1) of the Act, 7 U S C  § 6m(1)

17

66      Based upon and in connection with the foregoing conduct, Longhorn and Owen

are permanently restrained, enjoined and prohibited from directly or indirectly soliciting and

entering into agreements to manage client accounts without first delivering the mandatory

Disclosure Document to these prospective clients prior to managing such accounts, and

managing client accounts without receiving back from these prospective clients an

acknowledgement that these prospective clients received the Disclosure Document in violation

of Regulation Section 4 31(a) and (b), 17 C F R  § 4 31(a) and (b)

**IT IS FURTHER ORDERED THAT:**

67      Defendants are permanently restrained, enjoined and prohibited from directly or

indirectly

>       a       engaging in any commodities trading that is subject to the rules of a
>       contract market or, pursuant to Section 5a of the Act, 7 U S C  § 7a(a), a
>       Derivatives Transaction Execution Facility in any account A) that is held in the
>       name of a Defendant, B) in which a Defendant has a direct or indirect financial
>       interest, or C) held in the name of any other person, and
>
>       b       applying for registration or claiming exemption from registration with the
>       Commission in any capacity, or engaging in any activity requiring such
>       registration or exemption from registration with the Commission, except as
>       provided for in Regulation 4 14 (a)(9), or acting as a principal, agent or any other
>       officer or employee of any person registered, exempted from registration or
>       required to be registered with the Commission, except as provided for in
>       Regulation 4 14 (a)(9)  This includes, but is not limited to, soliciting, accepting or
>       receiving any funds, revenue or other property from any person, giving

18

commodity trading advice for compensation, except as provided for in Regulation

4 14 (a)(9), soliciting prospective customers, related to the purchase or sale of any

commodity futures, security futures, options, options on futures, or foreign

currency futures

## V.    ORDER FOR OTHER EQUITABLE RELIEF

**IT IS FURTHER ORDERED THAT:**

68      Restitution    Defendants are hereby jointly and severally liable to pay restitution

in the amount of $308,439 76, plus post-judgment interest to accrue beginning on the date this

Order is entered and payable at the interest rate set forth in 28 U S C  § 1961   All restitution

payments as set forth in this paragraph shall be made by electronic funds transfer, or by U S

postal money order, certified check, bank cashier's check, or bank money order, made payable to

the Commodity Futures Trading Commission, and sent to Daniel Driscoll, Monitor, National

Futures Association, 200 W  Madison St , #1600, Chicago, IL 60606-3447 under a cover letter

that identifies Owen, Longhorn and Phoenix and the name and docket number of the

proceedings  Defendants shall simultaneously transmit a copy of the cover letter and the form of

payment to Gregory Mocek, or his successor, Director, Division of Enforcement, Commodity

Futures Trading Commission, at the following address  Three Lafayette Centre, 1155 21st Street,

N W , Washington, D C 20581

69      The National Futures Association is designated as Monitor to oversee any

restitution payments made to the Commission by Defendants

70      The Monitor will distribute funds obtained from Defendants in an equitable

fashion as determined by the Monitor to all persons who gave funds, either directly or indirectly,

to Defendants as a result of their course of illegal conduct alleged in the complaint and any other investor upon sufficient proof of his or her investment with Defendants

71    Civil Monetary Penalty    Defendant Owen is ordered to pay a $480,000 CMP, Defendant Longhorn is ordered to pay a $480,000 CMP, and Defendant Phoenix is ordered to pay a $480,000 CMP  Defendants shall make their CMP payments by electronic funds transfer, or by U S  postal money order, certified check, bank cashier's check, or bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N W , Washington, D C  20581, under a cover letter that identifies Owen, Longhorn and Phoenix and the name and docket number of the proceedings  Each Defendant shall simultaneously transmit a copy of the cover letter and the form of payment to the Monitor and to Gregory Mocek, or his successor, Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address  Three Lafayette Centre, 1155 21st Street, N W , Washington, D C  20581

## VI.    MISCELLANEOUS PROVISIONS

72    Notices    All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows  Notice to Commission  Attention - Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N W , Washington, DC 20581, Notice to NFA – Daniel Driscoll, National Futures Association, 200 W  Madison St , #1600, Chicago, IL 60606-3447

73    Entire Agreement and Amendments    This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto   Nothing shall serve to amend

20

or modify this Consent Order in any respect whatsoever, unless  (1) reduced to writing, (2) signed by all parties hereto, and (3) approved by order of this Court

74     Invalidation   If any provision of this Consent Order, or if the application of any provisions or circumstances is held invalid, the remainder of the Consent Order and the application of the provisions to any other person or circumstance shall not be affected by the holding

75     Waiver   The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order   No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order

76     Acknowledgements   Upon being served with copies of this Consent Order after entry by the Court, the Defendants shall sign acknowledgments of such service and serve such acknowledgments on the Court and the Commission within seven (7) calendar days

77     Continuing Jurisdiction of this Court   This Court shall retain jurisdiction of this cause to assure compliance with this Consent Order and for all other purposes related to this action

78     Authority   Owen hereby warrants that he is the sole owner and operator of Longhorn that this Consent Order has been duly authorized by Chase and he has been duly empowered to sign and submit it on behalf of Longhorn   Owen also warrants that he is the co-owner of Phoenix, and that this Consent Order has been duly authorized by Phoenix and he has been duly empowered to sign and submit it on behalf of Phoenix

21

There being no just reason for delay, the Clerk of the Court is hereby directed to enter

this Consent Order.

IT IS SO ORDERED

*CONSENTED TO AND APPROVED BY*


Date _____

_____
Roger Owen, Individually and on
behalf of Longhorn Financial Advisors, LLC

*See Attached.*
Date _____

_____
Roger Owen on behalf of Phoenix
Financial Group


_____
Richard Glaser, Esq (Pro Hac Vice)
Commodity Futures Trading Commission
1155 21st St., NW
Washington, DC 20581
Attorney for Plaintiff

Date _____


SO ORDERED, on this _____ day of _____ 2006

HONORABLE JAMES A. BEATY, JR,
UNITED STATES DISTRICT JUDGE

Signed
3/28/06

22

*CONSENTED TO AND APPROVED BY*

Date _12-28-05_

Roger Owen, Individually and on
behalf of Longhorn Financial Advisors, LLC

Date _12-28-05_

Roger Owen on behalf of Phoenix
Financial Group

Date _3/15/06_

Richard Glaser, Esq (Pro Hac Vice)
Commodity Futures Trading Commission
1155 21st St, NW
Washington, DC 20581
Attorney for Plaintiff

22